UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ISAIAS LOPEZ, JR.,

                Petitioner,               03 Civ. 7087 (RJH)

      - against -              **MEMORANDUM OPINION**
                                       **AND ORDER**

DALE ARTUS, Superintendent,
Clinton Correctional Facility,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Petitioner Isaias Lopez, Jr., currently confined at Clinton Correctional Facility in

Dannemora, New York, seeks a writ of habeas corpus relief pursuant to 28 U.S.C. §

2254. In 1995, petitioner pleaded guilty in New York Supreme Court, New York

County, to second-degree murder, first-degree aggravated sexual abuse, and first-degree

robbery. Pursuant to a negotiated plea agreement, petitioner was sentenced to concurrent,

indeterminate prison sentences of twenty-five years to life on the murder count, and eight

and a third to twenty-five years on each of the remaining counts. Petitioner now contends

that he was denied the effective assistance of counsel with regard to his guilty plea

because his attorney's mental illness rendered him incapable of practicing law. For the

reasons set forth below, the petition is denied.


## I. BACKGROUND

      On August 5, 1992, Petitioner Lopez gained entrance to the home of his father's

mistress, Milagros Montero, by asking to borrow her video camera. *People v. Lopez*, No.

7874-92, slip op. at 1 (N.Y. Sup. Ct. July 9, 2001). Inside, Lopez produced a hatchet he had concealed on his person and bludgeoned Montero with it. *Id*. Petitioner then forced Montero onto the couch, continued to strike her with the hatchet, strangled her with electrical wire, and smothered her with cushions. *Id*. While Montero was still alive, petitioner sexually abused her body. *Id*. After Montero died, Lopez pried the rings from her fingers and looted her apartment, taking Montero's video camera and other items. *Id*. Upon leaving the building, Lopez and a companion strolled down the street, filming themselves with the video camera. (Resp't Mem. 2.) At one point on the videotape, Lopez held up some of the stolen jewelry and gloated. *Lopez*, No. 7874-92, slip op. at 1.

The next day, the police obtained a search warrant for petitioner's college dormitory room. *Id*. at 2. In the room, the police discovered the video camera and the videotape. *Id*. Lopez was arrested the same day. After waiving his *Miranda* rights, he confessed to a police detective that he had murdered Montero. (Resp't Mem. 2.) That night, after again waiving his *Miranda* rights, Lopez gave a videotaped statement to an Assistant District Attorney, in which he provided the grisly details of his crimes. *Id*. Lopez retained Joseph Charleman as counsel. *Id*. at 4.

Alleging that petitioner was mentally incompetent, Charleman moved for an examination of Lopez pursuant to Article 730 of the New York Criminal Procedure Law (N.Y. C.P.L.) to determine whether Lopez was competent to stand trial. *Lopez*, No. 7874-92, slip op. at 2. Lopez was subsequently admitted to Bellevue Hospital and comprehensively examined. (Resp't Mem. 5.) A competency hearing commenced before Justice James A. Yates on March 7, 1994. *Id*. at 6. At the hearing, a court-appointed forensic psychiatrist, Luis Zeiguer, and a psychologist, Sanford Drob, each

testified that after examining Lopez at Bellevue Hospital, they had concluded that he was feigning incompetence. *Id*. at 6. Both doctors stated that petitioner was competent to stand trial. *Id*. at 5-6. Lopez testified that he had no understanding of the proceedings and gave nonsensical answers to simple questions. *Id*. at 6. The defense called its own psychiatrist, Dr. Stephen Teich, who testified to his opinion that Lopez was unfit to stand trial. *Id*. On April 7, 1994, Justice Yates found Lopez competent to stand trial. *Lopez*, No. 7874-92, slip op. at 2.

Shortly after the competency hearing, Lopez decided to hire Sergio Linietsky based on the recommendation of a cellmate. *Id*. at 2. Linietsky was then petitioner's sole attorney on these charges until petitioner's sentencing. *Id*. at 2, n.1. Linietsky informed the court that he intended to offer a defense based on temporary insanity and extreme emotional disturbance, and arranged for Lopez to be examined by several physicians. (Resp't Mem. 8.) Between June 1994 and March 1995, the case was adjourned several times pending the preparation of the defense psychiatric report. *Id*. at 7. During that period, Linietsky engaged in repeated plea negotiations with the Assistant District Attorney assigned to petitioner's case. *Id*. at 11. Linietsky failed to appear at some of petitioner's court proceedings. *Lopez*, No. 7874-92, slip op. at 2. His appearance at other proceedings, with the exception of the plea and sentence proceedings, were brief calendar adjournments. *Id*.

While he was representing Lopez, Linietsky became the subject of eight complaints to the Grievance Committee of the Appellate Division of the New York Supreme Court regarding his increasingly "bizarre, threatening and impulsive behavior." *Id*. at 2. On three separate occasions in 1994 and 1995, Linietsky was called to testify

before counsel to the Grievance Committee in response to the complaints. (Resp't Mem. 20.) In his testimony, Linietsky exhibited severe paranoia, incoherently describing fantastic and imagined conspiracies. *Lopez*, No. 7874-92, slip op. at 4. Linietsky repeatedly displayed a highly delusional character and engaged in irrational behavior. *Id.* The Grievance Committee ordered Linietsky to undergo a psychiatric evaluation. (Resp't Mem. 21.) The court-appointed psychiatrist, Dr. Frederic Gannon, diagnosed Linietsky with Schizotypal Personality Disorder and found him too mentally incapacitated to continue the practice of law. (Pet'r Ex. F.) The complaints and investigation by the Grievance Committee were, for the most part, coextensive with the period of time that Linietsky represented petitioner, commencing in March 1994 and ending with Linietsky's suspension in September 1995. *Lopez*, No. 7874-92, slip op. at 3. The trial court for petitioner's case was unaware of the complaints against Linietsky, as well as of the ongoing Grievance Committee investigation. *Id.* at 3-4.

On August 11, 1995, the Assistant District Attorney disclosed to the trial court at a bench conference the existence of several letters Lopez had written from jail to friends, in which he admitted to feigning his psychiatric symptoms in order to fool the examining psychiatrists. *Lopez*, No. 7874-92, slip op. at 13. One letter stated, "[J]ust think of me faking and suckering these authorities of law that I am retarded and then having to turn me over to the State as a mentally ill person, then fool the hospital to release me when they see I am normal." *Id.* Subsequently, Linietsky negotiated a plea agreement whereby the People, in return for Lopez's guilty plea, agreed to recommend a prison sentence of twenty-five years to life for the murder charge and concurrent sentences of eight years to life for the other two charges. *Id.* Without a plea agreement, the murder charge carried a

potential sentence of twenty-five years to life, along with a potential consecutive sentence for the sexual assault. *Id*. at 13-14.

On August 18, 1995, Lopez appeared with Linietsky before Justice Yates and pleaded guilty to second-degree murder, first-degree aggravated sexual abuse, and first-degree robbery, pursuant to his plea agreement. *Lopez*, No. 7874-92, slip op. at 14. In response to questions by the court, Lopez affirmed that he understood the purpose of the proceedings, that he had discussed his case with Linietsky, and that he was satisfied with Linietsky's representation. *Id*. Lopez further stated he had conferred with Linietsky on potential defenses concerning his mental competency, and that he wished to abandon all these potential defenses. (Resp't Ex. M at 3-5.) After the plea, Linietsky reiterated to the court that Lopez should be deemed less culpable for the offenses and requested mercy because of mitigating circumstances. *Lopez*, No. 7874-92, slip op. at 14. On September 21, 1995, Justice Yates imposed sentence pursuant to the negotiated plea agreement. (Resp't Ex. N.)

On December 15, 1995, Linietsky was suspended from the New York Bar after the Appellate Division found that he was "incapacitated by reason of mental infirmity or illness." *Lopez*, No. 7874-92, slip op. at 2. Specifically, the Appellate Division confirmed three findings: (1) Linietsky engaged in a pattern of threatening, harassing, and extortionate behavior; (2) Linietsky knowingly submitted false and erroneous information to the Grievance Committee during the course of an investigation; and (3) Linietsky engaged in conduct prejudicial to the administration of justice. *Id*. at 4, n.8.

On January 21, 2000, Lopez filed a motion to vacate the plea and set aside his conviction pursuant to N.Y. C.P.L. 440.10, arguing that he had received ineffective

assistance of counsel with regard to his guilty plea. (Resp't Ex. O at 1.) Lopez alleged

that Linietsky's mental illness had rendered him incapable of practicing law, and

therefore had left Lopez essentially without counsel. *Id*. at 4. The state trial court

reviewed the findings of the Grievance Committee and heard testimony from Dr.

Gannon, who asserted that Linietsky was incapable of giving reasonable competent

advice because of his mental illness. *Lopez*, No. 7874-92, slip op. at 2-10. Petitioner's

relatives and the Assistant District Attorney who handled petitioner's case also testified

about Linietsky's behavior while he was representing petitioner. *Id*. at 10-12. On July 9,

2001, Justice Yates denied Lopez's motion to set aside his conviction. *Id*. at 20.

Applying the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for

evaluating ineffective assistance of counsel claims, the court found no evidence that

Linietsky's mental condition had affected his performance in Lopez's case. *Id*. at 15, 19.

Petitioner appealed to the New York Appellate Division, First Department, which

unanimously affirmed his conviction. *People v. Lopez*, 747 N.Y.S.2d 498 (App. Div.

2002). Judge Richard C. Wesley denied Lopez's application for leave to appeal to the

New York Court of Appeals on February 7, 2003. *People v. Lopez*, 99 N.Y.2d 616

(2003).


## II. STANDARD OF REVIEW

Lopez filed his habeas petition after the effective date of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"). Thus, this Court applies the standard

of review established by Section 2254(d) of AEDPA. *Torres v. Berbary*, 340 F.3d 63,

67-68 (2d Cir. 2003); *Vasquez v. Strack*, 228 F.3d 143, 147 (2d Cir. 2000). Under

AEDPA, a federal court may grant a petition for habeas corpus, notwithstanding a contrary state court adjudication on the merits, in accordance with the following provisions:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). A state court's decision is "contrary to" clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 412-13. An "unreasonable application" of "clearly established" Supreme Court precedent occurs when a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." *Id*. at 413.[1]  The focus of the "unreasonable application" inquiry is whether the state court's application of clearly established federal law is objectively unreasonable.  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Williams*, 529 U.S. at 410.  Thus, under Section 2254(d)(1)'s "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."[2]  *Id*. at 411.

This deferential review of state court judgments is available only when the federal claim has been "adjudicated on the merits" by the state court.  *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001).  If there is no such adjudication, the deferential standard does not apply, and "we apply the pre-AEDPA standards, and review *de novo* the state court

---

[1] The Second Circuit has also construed the "unreasonable application" clause to apply when "the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed."  *Kennaugh v. Miller*, 289 F.3d 36, 45 & n.2 (2d Cir. 2002).

[2] The Second Circuit has stated that a federal court reviewing a habeas petition may articulate its view of federal law, even when the state court's interpretation was not unreasonable.  *See Kruelski v. Connecticut Super. Ct. for Judicial*, 316 F.3d 103, 106 (2d Cir. 2003).  The court proposed a two-step procedure for a federal court's consideration of a habeas petition under AEDPA.  First, the federal court must determine the correct interpretation of Supreme Court precedent.  Second, if the state court's understanding or application of that precedent is determined to be erroneous, the federal court must still ask whether that error was a reasonable one.  *Id*.  However, the court emphasized that this two-step approach, while helpful in providing state courts with guidance as to the correct interpretation of federal law, is not mandatory.  *Id*. at 106, n.3 ("It is…quite understandable if a district court…should prefer not to go through such a process and rule directly on the reasonableness of the state court's approach, leaving any future guidance solely to the courts of appeals.").

disposition of the petitioner's federal constitutional claims." *Id.* at 93 (citing *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001)). For the purposes of AEDPA, a state court "adjudicates" a petitioner's federal constitutional claims "on the merits" whenever "it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kulman*, 261 F.3d 303, 312 (2d Cir. 2001). When a state court does so, a federal habeas court must defer in the manner prescribed by AEDPA to the state court's decision on the federal claim, even if the state court does not explicitly refer to either the federal claim or to relevant federal case law. *Id.* To determine whether a state court has disposed of a claim on the merits, the Court considers: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Id.* at 314 (quoting *Mercadel v. Cain*, 179 F.3d 271, 274 (5th Cir. 1999)).

Applying these considerations, it is clear that petitioner's claim of ineffective assistance of counsel was "adjudicated on the merits" by the state court. The Appellate Division found that Lopez was not deprived of his Sixth Amendment right to effective assistance of counsel because Linietsky's representation in connection with petitioner's guilty plea was "meaningful, effective, and competent." *Lopez*, 747 N.Y.S.2d at 500. Thus, because Lopez's claims have been "adjudicated on the merits" by a state court, this Court will review that decision under AEDPA's deferential scope of review.[3]

---

[3] The Court reviews the decision of the Appellate Division, which was the highest New York State court to have reviewed Petitioner's claims. *See Swift v. Goord*, No. 02 Civ. 3448 (RCC), 2004 WL 2434966, at *3 (S.D.N.Y. Nov. 1, 2004) (reviewing the decision of the Appellate Division and the actions of the New York Supreme Court that tried the case in the first instance). By extension, the Court also reviews the decision of the New

### III.  INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Lopez asserts that it was unreasonable for the state courts to conclude that the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a petitioner to make a particularized showing of prejudice, applied to his ineffective assistance of counsel claim.  (Pet'r Reply Mem. 12.)  Although it is well established that *Strickland* applies to ineffective assistance claims arising out of the plea process, *see Hill v. Lockhart*, 474 U.S. 52, 58 (1985), Lopez nevertheless contends that the state courts should have applied *United States v. Cronic*, 466 U.S. 648 (1984) in finding that Linietsky's mental incapacitation constituted *per se* ineffective assistance of counsel, thereby vitiating the need for a particularized showing of prejudice.  *Id.*

Alternatively, petitioner contends that even if *Strickland* did apply to his case, the state courts unreasonably applied that standard.  (Pet'r Mem. of Law 48.)  However, Lopez does not identify any specific events showing that Linietsky performed deficiently with regard to petitioner's plea bargaining process, other than alleging that Linietsky's mental incapacity "rendered him particularly incapable of advising Lopez on any defense based on mental disease."  *Id.* at 48-49.  Rather, petitioner insists that he himself had a viable defense based on his own mental condition.  *Id.* at 48.

---

York Supreme Court, *see Cotto v. Lord*, No. 99 Civ. 4874 (JGK), 2001 WL 21246, at *14 (S.D.N.Y. Jan. 9, 2001) (the conclusions reached by the state trial court, and the Appellate Division in affirming the state trial court's decision, did not constitute an objectively unreasonable application of Supreme Court precedents), since the Appellate Division found that the lower court's consideration of the pertinent facts and applicable law was proper.  *See Lopez*, 747 N.Y.S.2d at 499.

## A.  Applicability of *Strickland*

The Supreme Court has not yet ruled on whether an attorney's mental illness during the period of representation constitutes a *per se* denial of the Sixth Amendment right to counsel.[4]  In *Cronic*, the Supreme Court noted that although the burden typically "rests on the accused to demonstrate a constitutional violation," there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."  *Cronic*, 466 U.S. at 658.  The Court identified three situations in which prejudice would be presumed: (1) if the accused is denied counsel at a critical stage of his trial; (2) if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; or  (3) the accused's counsel is called upon to render assistance under circumstances in which it is unlikely that any lawyer would be able to provide effective assistance.  *Id*. at 659-60; *see also Bell*, 535 U.S. at 695.  In any of those situations, the defendant need not show that the proceedings were affected.  *Cronic*, 466 U.S. at 660.  Apart from circumstances of that magnitude, the accused must show how

---

[4] Lopez argues that *Bell v. Cone*, 535 U.S. 685 (2002) provides "inferential support that the clearly established precedent of *Cronic* and earlier Supreme Court cases reasonably applies to circumstances where an accused person is represented by a mentally incapacitated attorney."  (Pet'r Reply Mem. 13.)  He maintains that the Supreme Court could have dismissed the petitioner's claim of *per se* prejudice in *Bell* by holding that the *Cronic* standard may *never* apply to claims involving mentally incapacitated attorneys. (Pet'r Reply. Mem. 13.)  Instead, the Court appeared to decline the application of a *per se* rule because there was no evidence in the case before it regarding the defense counsel's mental health during the state court proceedings.  *Bell*, 535 U.S. at 697 n.4.  Lopez asserts that the *Bell* Court's choice of reasoning supports the proposition that a *per se* rule "reasonably applies" to circumstances where a defendant's attorney is mentally incapacitated.  This Court does not read *Bell* to provide the "inferential support" that petitioner argues for.  Since the underlying facts in *Bell* did not support the allegation that the defendant's attorney was mentally ill during the defendant's trial, there was simply no reason for the Court to reach the broader question of whether a *per se* rule could potentially apply to cases involving an attorney's mental incapacitation.

specific errors of counsel undermined the reliability of the finding of guilt under the *Strickland* framework. *Strickland*, 466 U.S. at 693; *Cronic*, 466 U.S. at 659 n.26.

Although *Cronic* did not explicitly address whether the severely impaired mental condition of the accused's counsel constitutes a *per se* denial of effective assistance under the Sixth Amendment, petitioner nevertheless contends that Linietsky's mental illness fell within the first exception articulated in *Cronic*. (Pet'r Mem. of Law 47.) Specifically, petitioner argues that having an attorney who has been found "mentally incapacitated to practice law by a non-partisan psychiatrist" is practically the same as being denied counsel altogether. (Pet'r Mem. of Law 47.) In response, the State asserts that no Supreme Court case (or any other case, for that matter) recognizes the *per se* rule advocated by petitioner, and that federal courts cannot create a new rule under the limited jurisdiction of habeas corpus review. (Resp't Mem. 42.) Furthermore, the State maintains that the exception to the *Strickland* standard advocated by petitioner cannot remotely be deemed the only reasonable interpretation of Supreme Court precedent. *Id.* Therefore, the State argues, petitioner's habeas corpus claim must fail. *Id.*

The Second Circuit has applied the *per se* rule in only two situations: when, unknown to the defendant, counsel was, at the time of representation, "(1) not duly licensed to practice law because of a failure ever to meet the substantive requirements for the practice of law, or (2) implicated in the defendant's crimes." *United States v. Rondon*, 204 F.3d 376, 379-80 (2d Cir. 2000) (quoting *Bellamy v. Cogdell*, 974 F.2d 302, 306 (2d Cir. 1992)) (citations omitted).[5] In every other situation, the Second Circuit has

---

[5] Although AEDPA looks to Supreme Court precedent in its reference to "clearly established Federal law," *see* 28 U.S.C. § 2254(d)(1), federal habeas courts may consider the decisions of inferior federal courts as "helpful amplifications of Supreme Court

refused to apply the *per se* rule. *Rondon*, 204 F.2d at 380. Moreover, even in the two

situations where the *per se* rule was found applicable, the Second Circuit has resorted to

it "without enthusiasm." *Solina v. United States*, 709 F.2d 160, 169 (2d Cir. 1983); *see*

*Hurel Guerrero v. U.S.*, 186 F.3d 275, 279 (2d Cir. 1999) ("We have consistently

acknowledged…that we are disinclined to resort to [the] *per se* rule."); *Waterhouse v.*

*Rodriguez*, 848 F.2d 375, 383 (2d Cir. 1988); *see also Tippins v. Walker*, 77 F.3d 682,

686 (2d Cir. 1996) ("We are reluctant to extend a rule of *per se* prejudice in any new

direction."). The Second Circuit has advanced two rationales for applying the *per se* rule:

> The first is "jurisdictional" and applies in cases where the attorney is not duly
>
> licensed at the time of trial….The second rationale is based on notions of conflict
>
> of interest, and applies in cases both where the lawyer is not duly licensed and
>
> where the lawyer is implicated in the crimes of his or her client. In these
>
> circumstances, the defense is necessarily compromised because the advocate
>
> ordinarily "cannot be wholly free from fear of what might happen if a vigorous
>
> defense should lead the prosecutor or the trial judge to inquire into his [or her]
>
> background and discover his [or her] lack of credentials[,]" or own wrongdoing.

---

precedent" in "evaluating whether the state court's application of the law was
reasonable." *Matteo v. Superintendent,* 171 F.3d 877, 890 (3d Cir.1999) (en banc);
*O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998) ("To the extent that inferior federal
courts have decided factually similar cases, reference to those decisions is appropriate in
assessing the reasonableness *vel non* of the state court's treatment of the contested
issue."); *Bohan v. Kulmann*, 234 F. Supp. 2d 231, 248 n.10 (S.D.N.Y. 2002) (a district
court is not required to disregard a Circuit court's interpretation of "clearly established
Federal law, as determined by the Supreme Court"); *Shiwlochan v. Portuondo*, 345
F.Supp.2d 242, 263 (E.D.N.Y. 2004). Thus, in the absence of clear Supreme Court
jurisprudence on a due process claim, it is helpful to examine decisions of inferior federal
courts to determine whether the state court's application of the law was unreasonable
under § 2254(d)(1).

Regardless of the facts presented, application of the *per se* rule must be justified under one or both of these rationales.

*Bellamy*, 974 F.2d at 306-07 (citations omitted).

In *Bellamy*, the defendant's counsel was suspended from practice after defendant's trial based on his pretrial admission of mental and physical incapacity. The defendant filed a writ for habeas corpus in the Eastern District of New York, claiming he suffered a *per se* denial of counsel. *Bellamy*, 974 F.2d at 306. The Second Circuit declined to extend a *per se* rule to mental incapacity. The court first noted the Supreme Court's admonishment that "[p]er se rules should not be applied…in situations where the generalization is incorrect as an empirical matter; the justification for a conclusive presumption disappears when application of the presumption will not reach the correct result most of the time." *Id*. at 308 (quoting *Coleman v. Thompson*, 501 U.S. 722, 737 (1991)). The court then concluded:

> [T]here is simply nothing inherent in an attorney's illness that necessarily will impede a spirited defense "most of the time" to justify finding the attorney's representation *per se* ineffective. Rather, given the varying effects health problems can have on an individual's ability to function, claims of ineffective assistance based on attorney illness are best suited to the fact-specific prejudice inquiry mandated by *Strickland*.

*Id*. at 308. The *Bellamy* court's holding was buttressed by the fact that a hearing held to probe the issue of the attorney's competence indicated that the attorney had no mental incapacity at the time of the defendant's trial. *Id*.

The Second Circuit's approach in *Bellamy* is consistent with the pronouncements of other Circuits. Although occasionally acknowledging that an attorney's mental impairment may compromise his trial representation in ways that are not readily apparent to the trial judge, courts have generally declined to adopt a *per se* rule for mentally impaired defense counsel. *See, e.g., Smith v. Ylst*, 826 F.2d 872, 876 (9th Cir. 1987) (counsel's mental illness and subsequent replacement during trial did not constitute ineffective assistance of counsel where defendant did not show how counsel's action prejudiced him); *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) (there was no merit in petitioners' allegations that their trial attorney was "too old and sick" to represent them, especially since petitioners made no adequate allegation of specific prejudice resulting from counsel's supposed illness); *Pilchak v. Camper*, 741 F. Supp. 782, 792-93 (W.D. Mo. 1990), *aff'd*, 935 F.2d 145 (8th Cir. 1991) (allegations demonstrating that defense counsel was mentally impaired at the time of petitioner's trial did not amount to ineffective assistance of counsel without a showing of actual prejudice); *United States ex rel. Pugach v. Mancusi*, 310 F. Supp. 691 (S.D.N.Y.), *aff'd*, 411 F.2d 177 (2d Cir. 1969) (although proof that a defendant's attorney was mentally incapacitated may constitute deprivation of the effective assistance of counsel, the attorney's behavior did not prejudice petitioner and had little impact on the result of his case).

In *Smith*, the defendant submitted declarations describing his attorney's conduct during the time of trial and trial preparation. *Smith*, 826 F.2d at 874. The attorney's secretary said that the attorney told her he was crazy and wanted to go to an insane asylum. *Id.* Two psychiatric reports indicated that the attorney exhibited a paranoid

psychotic reaction. *Id.* On the other hand, the prosecuting attorney offered a declaration that the attorney acted no differently than any other criminal defense attorney. *Id.* The district court rejected the invitation to adopt a *per se* rule, reasoning that the "mere existence of a loosely described mental illness or condition cannot be assumed to affect legal proceedings unless the condition manifests itself in courtroom behavior." *Id.* at 875. The court further held that mental illness is "too varied in its symptoms and effects to justify a *per se* reversal rule without evidence that the attorney's performance fell below the constitutional norm." *Id.* at 876. The Ninth Circuit agreed with this analysis, concluding, "Rather than attempt to identify mental illnesses that would presumptively disable an attorney from conducting a criminal defense we believe it is more prudent to evaluate the attorney's actual conduct of a trial in light of allegations of mental incompetence." *Id.* The court also held that the trial court reasonably found that the evidence did not raise a genuine doubt about the attorney's competence. *Id.* at 877.

The Court discerns no reason to depart from these cases in fashioning a new *per se* exception where neither the Supreme Court, Second Circuit, nor other cases speak to supporting that relief. Although petitioner urges the Court to recognize such an exception as a "reasonable extension" of *Cronic*, (Pet'r Reply Mem. 12), petitioner has fundamentally misunderstood the "unreasonable application" standard.[6] Applying that

_____

[6] In *Torres v. Berbary*, 340 F.3d 63, 72 (2d Cir. 2003), which petitioner cites to in support of his argument, the Second Circuit vacated the district court's denial of a writ of habeas corpus on the ground that the state court had applied federal law to the facts of the case in an objectively unreasonable manner. *Torres*, 340 F.3d at 71. The state court's application of federal law was "unreasonable" because "well-settled and clearly established Supreme Court due process jurisprudence or, at the very least, a reasonable extension of it, *mandate[d]* a finding of denial of due process in [the petitioner's] sentencing." *Id.* at 72 (emphasis added). In the instant case, the Supreme Court has not clearly spoken on the issue of whether representation by a mentally incapacitated attorney

16

standard, the Court concludes that the state courts did not unreasonably apply federal law in finding that *Strickland*, and not *Cronic*, controlled in this case. Therefore, the Court moves to the examination of the state courts' application of *Strickland*.

## B. Application of *Strickland*

*Strickland* set forth a two-prong test for a finding of ineffective assistance of counsel: (1) petitioner must show that counsel's performance fell below the "prevailing professional norms," thus failing to meet an "objective standard of reasonableness," and (2) petitioner must "show that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687-88. For Lopez to succeed, "he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell*, 535 U.S. at 698-99. Rather, as explained above, under Section 2254(d)(1)'s "unreasonable application" clause, Lopez must show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Id*. at 699.

### The First Prong of *Strickland*

In the context of guilty pleas, the first prong of the *Strickland* test requires an inquiry into whether counsel's advice "was within the range of competence demanded of

---

constitutes a *per se* denial of effective assistance of counsel. Moreover, a reasonable extension of Supreme Court case law does not *mandate* a finding of denial of due process under these circumstances. Although Lopez's interpretation of *Cronic* may be one reasonable reading of that case, Lopez fails to show how the Appellate Division's failure to apply a *per se* rule to Linietsky's mental incapacity was an "objectively unreasonable" application of federal law.

attorneys in criminal cases." *Hill*, 474 U.S. at 58-59. There is a "strong presumption" that defense counsel's conduct fell within the broad spectrum of reasonable professional assistance. *Kimmelman v. Morrison,* 477 U.S. 365, 381 (1986) (citing *Strickland,* 466 U.S. at 688-89). A defendant bears the burden of proving "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Id*.

The Appellate Division held that Linietsky's "representation of defendant in connection with his guilty plea was meaningful, effective, and competent…." *Lopez*, 747 N.Y.S.2d at 499. The court found that Linietsky had "carefully explored possible lines of defense" even though it was "clear [Lopez] had no plausible defense whatsoever to the charges." *Id*. at 499. In light of the "powerful" evidence that Lopez had committed a "vicious, brutal and cruel" crime, as well as the prosecution's discovery of highly damaging letters written by Lopez which exposed his plan to feign mental illness, the court noted that it was Linietsky's "principal role" to seek the "most favorable disposition possible" and avoid a "long consecutive sentence." *Id*. Under these circumstances, the court concluded it was appropriate for Linietsky to advise Lopez to plead guilty pursuant to the offered agreement. *Id*. at 500. The agreement offered by the ADA ensured that Lopez would receive concurrent, instead of consecutive, sentences in exchange for his guilty plea. Thus, the state court concluded that Linietsky's performance did not fall below prevailing professional norms.

The Court agrees with the Appellate Division and finds that petitioner cannot satisfy the first prong of the *Strickland* test. The petitioner insists that he would have had a viable defense at trial based on his own mental condition. (Pet'r Mem. of Law 48.)

18

Petitioner bases his allegation on a defense psychiatrist's conclusion that Lopez "had a viable defense of mental disease or defect." (Pet'r Mem. of Law 48.) However, petitioner neglects to recognize that Linietsky pursued a defense based on Lopez's mental condition from the time he took on the case until Lopez's sentencing. *Lopez*, No. 7874-92, slip op. at 11-13. Linietsky informed the court that he intended to offer a defense of temporary insanity and extreme emotional disturbance. (Resp't Mem. 8.) To that end, Linietsky requested and was granted leave to have Lopez examined by several physicians. *Id.* Linietsky also arranged for a psychologist to interview Lopez's father in contemplation of a defense that Lopez's mental condition was influenced by his early home life. *Id.* at 10, 15. Moreover, Linietsky engaged in extensive plea negotiations with the prosecutor, urging him to give Lopez a better offer than twenty-five years to life. *Lopez*, No. 7874-92, slip op. at 19.

After the prosecution's discovery of the incriminating letters, however, the defense of mental illness became one that a jury was likely to reject. At that point, it was reasonable for Linietsky to advise petitioner to plead guilty. *See Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential….A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 689). A guilty plea allowed Lopez to serve concurrent sentences on the charges, instead of facing the

substantial likelihood of being convicted at trial and possibly receiving a longer sentence. It is clear that Linietsky's performance in connection with petitioner's guilty plea was well "within the range of competence demanded of attorneys in criminal cases." Thus, petitioner fails to satisfy the *Strickland* test and his habeas corpus petition must be denied.

**The Second Prong of *Strickland***

Even if petitioner had demonstrated that counsel's performance was deficient under the first prong of the *Strickland* test, he would also have to show prejudice under *Strickland*'s second prong. A petitioner must establish "that there is a reasonable probability that but for counsel's unprofessional errors, the result…would have been different." *Strickland,* 466 U.S. at 694. In the context of a guilty plea, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill,* 474 U.S. at 59.

In *Hill*, the Supreme Court indicated that the "prejudice" inquiry in many guilty plea cases will "closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." *Hill*, 474 U.S. at 59. The court explained:

> For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn,

will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Id.*

Significantly, Lopez fails to identify any events from which the Court could perceive the possibility of prejudice arising from Linietsky's representation. Lopez suggests that *he* had a viable defense based on his own mental illness, implying that with effective counsel, he would have successfully presented this defense at trial. (Pet'r Mem. of Law 48.) It is undisputed, however, that Linietsky investigated the possibility of a defense based on mental illness and had intended to use that defense at trial. In his plea allocution before the state trial court, Lopez stated that he and Linietsky had spent a great deal of time discussing the case and potential defenses concerning his mental competency. *Lopez*, No. 7874-92, slip op. at 14. Lopez then affirmed that he wished to abandon all of these defenses. (Resp't Ex. M 3-5.) *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *United States v. Hernandez*, 242 F.3d 110, 112-13 (2d Cir. 2001) (district court was entitled to rely upon the defendant's sworn statements made in open court that he understood the consequences of his plea and had discussed the plea with his attorney); *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997) ("A defendant's bald

statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea.").

Even assuming Lopez had gone to trial with a defense of mental disease, it is unlikely that he would have escaped conviction. The Second Circuit has suggested that when the evidence of a defendant's guilt is overwhelming, the burden of demonstrating prejudice to satisfy the second *Strickland* prong is virtually insurmountable. *See Strouse v. Leonardo,* 928 F.2d 548, 556 (2d Cir.1991) ("The evidence adduced at trial was so overwhelming that we cannot say there is a 'reasonable probability' that had the alleged errors in [counsel]'s performance not occurred 'the result of the proceeding would have been different.'"); *United States v. Simmons,* 923 F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against [the defendant], there is little reason to believe that alternative counsel would have fared any better."). Lopez videotaped himself with the camera he had stolen from his victim's apartment, *Lopez*, No. 7874-92, slip op. at 1, gave a detailed, videotaped confession of his brutal crimes after his arrest after waiving his Miranda rights, *id.* at 2, and bragged to his friends about his scheme to escape conviction by feigning mental illness, *id.* at 13. Clearly, the evidence against him was strong. Thus, even if Linietsky had not urged Lopez to plead guilty, there was no reasonable prospect that a jury would have concluded otherwise.

As a result of his guilty plea, petitioner ensured that he would receive concurrent, instead of consecutive, sentences on the charges. Where the defendant secured a significant strategic benefit by pleading guilty, courts are generally less likely to suspect an involuntary or misguided decision to plead. *See, e.g., Agyekum v. U.S.*, No. 01 Civ. 5808 (RWS), 2002 WL 1000950, at *7 (S.D.N.Y. May 16, 2002) (noting the various

benefits the defendant secured); *Feliz v. United States,* Nos. 01 Civ. 5544 (JFK), 00 Cr. 53 (JFK), 2002 WL 1964347, at *7 (S.D.N.Y. Aug.22, 2002) ("no prejudice exists when a plea agreement lessens the severity of the sentence defendant would face if convicted at trial") (citing *Moran v. United States,* No. 96 Civ. 3657 (CSH), 1998 WL 54616, at *5 (S.D.N.Y. Feb.10, 1998)).  Given these circumstances, Lopez cannot satisfy *Strickland*'s "prejudice" test.  *See Panuccio v. Kelly*, 927 F.2d 106, 109-10 (2d Cir. 1991) (petitioner was not denied effective assistance of counsel where there was a high likelihood that the affirmative defense would not have succeeded at trial and would have exposed petitioner to significant additional punishment); *Mitchell v. Scully*, 746 F.2d 951, 957 (2d Cir. 1984) (counsel's failure to advise the defendant of an affirmative defense that was unlikely to succeed did not fall outside the range of competence required of attorneys in criminal matters); *United States. v. Torres*, 113 F.3d 1230, 1997 WL 279893, at *2 (2d Cir. 1997) (defendant could not satisfy *Strickland*'s "prejudice" test where defendant's confession, the adverse testimony of his co-defendants, and the testimony of a duplicitous government witness made it unlikely that defendant would have escaped conviction at trial).  Having failed to meet either prong of the *Strickland* test, petitioner's *habeas* petition must be denied.

## CONCLUSION

The petition for a writ of habeas corpus is DENIED. Petitioner has not made a substantial showing of a denial of a federal right, *Tankleff v. Senkowski,* 135 F.3d 235, 241 (2d Cir. 1998), and as such, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court is directed to dismiss the petition and close this case.

SO ORDERED

Dated: New York, New York
     April 22, 2005

Richard J. Holwell
United States District Judge